# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

LORI NICHOLSON,

        Plaintiff,

vs.

BIOMET, INC; BIOMET
ORTHOPEDICS, LLC; BIOMET
MANUFACTURING CORP.; and
BIOMET US RECONSTRUCTION,
LLC,

        Defendants.

No. 18-CV-3057-CJW-KEM

**MEMORANDUM OPINION AND
ORDER**

_____

**TABLE OF CONTENTS**

I.     BACKGROUND ............................................................................... 5

II.    RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ............ 6

     A.     Applicable Law .................................................................... 6

     B.     Design Defect ....................................................................... 9

           1.     Evidence of Design Defect .............................................. 10

           2.     Reasonable Alternative Design ........................................ 11

           3.     Causation .................................................................... 13

     C.     Punitive Damages ................................................................ 13

D.     Conclusion ……………………………………………………………18

III.   DEFENDANT'S MOTION FOR A NEW TRIAL ………………………………19

    A.     Applicable Law ………………………………………………………………19

    B.     Against the Weight of the Evidence …………………………………………20

    C.     Legal Errors at Trial …………………………………………………………20

         1.     Allowing plaintiff to introduce unrelated second-generation metal-on-metal devices and post-sale evidence, but preventing defendants from presenting evidence to distinguish the M2a Magnum from other second-generation devices …………………………………………20

         2.     Refusing to instruct the jury that defendant's warnings were adequate as a matter of law …………………………………………24

         3.     Admitting Dr. Naide's causation opinions …………………………26

         4.     Dr. Li's new, undisclosed opinions regarding causation and future damages …………………………………………………………27

              a.     Exceeded scope of non-retained treating physician ……….27

              b.     Unreliable under FRE 702 …………………………………30

         5.     Dr. Kantor's testimony ……………………………………………31

         6.     Mari Truman medical causation testimony …………………………33

         7.     Biomet's 2014 sale price …………………………………………35

         8.     Applying Iowa law to punitive damages …………………………37

         9.     Submitting punitive damages to jury ……………………………40

        10.     Cumulative effect ........................................................40

    D.     Remittitur ...............................................................................41

IV.    MOTION TO AMEND JUDGMENT ................................................45

    A.     Pre and Post-Judgment Interest ...................................................47

    B.     Punitive Damages ...................................................................48

V.    BILL OF COSTS.........................................................................50

    A.     Applicable Law.......................................................................50

    B.     Analysis...............................................................................51

        1.     Fees of the Clerk............................................................52

        2.     Fees for Service of the Summons and Complaint ....................53

        3.     Fees for Transcripts ........................................................54

        4.     Fees and Disbursements for Printing ...................................56

        5.     Fees for Witnesses.........................................................57

        6.     Copying Fees ...............................................................57

        7.     Other Costs .................................................................58

    C.     Conclusion ...........................................................................60

VI.    CONCLUSION ...........................................................................61

Case 3:18-cv-03057-CJW-KEM   Document 473   Filed 05/06/21   Page 3 of 61

This matter is before the Court on defendant's[1] Renewed Motion for Judgment as a Matter of Law (Doc. 427), defendant's Motion for New Trial, or in the Alternative, for Remittitur (Doc. 425)[2], and plaintiff's Motion to Amend the Final Judgment (Doc. 433). Plaintiff timely resisted defendant's Renewed Motion for Judgment as a Matter of Law (Doc. 444) and defendant filed a timely reply (Doc. 461). Plaintiff also timely resisted defendant's Motion for a New Trial (Doc. 445) and defendant filed a timely reply (Doc. 462). Defendant timely resisted plaintiff's Motion to Amend the Final Judgment. (Doc. 438).

This matter is also before the Court on plaintiff's Bill of Costs. (Doc. 424). On December 21, 2020, defendant filed objections to plaintiff's Bill of Costs (Doc. 432) and on January 11, 2021, plaintiff replied to the objections (Doc. 440).

On March 5, 2021, the Court held a hearing on the above matters. (Doc. 467). Although the Court informed the parties that they were free to present arguments on all the motions, the parties limited their oral arguments to defendant's Renewed Motion for Judgment as a Matter of Law and defendant's Motion for a New Trial. (*Id.*). Following the hearing the parties filed supplemental briefing, although the Court did not request the briefing and the parties did not seek leave of Court to do so. (Docs. 468, 469, & 470).

For the following reasons, defendant's Renewed Motion for Judgment as a Matter of Law is **denied**. (Doc. 427). Defendant's Motion for a New Trial is **denied**. (Doc.

---

[1] Throughout the proceedings in this case, both parties have referred to defendants Biomet, Inc., Biomet Orthopedics, LLC, Biomet Manufacturing Corp., and Biomet US Reconstruction, LLC collectively as "Biomet." For ease of reference, the Court will refer to the defendants collectively as either Biomet or in the singular.

[2] Defendant originally filed its briefs in support of its motion for a new trial and its motion for judgment as a matter of law on December 21, 2020. *See* (Docs. 430 & 431). On February 18, 2021, defendant filed updated versions of the same brief with citations to the official trial transcript, which was made available after they filed their initial brief. *See* (Docs. 465 & 466). The Court will cite to the first briefs in this order.

4

425). Plaintiff's Motion to Amend the Judgment is **granted**. (Doc. 433). Defendant's objections to the Bill of Costs (Doc. 432) are **sustained in part and overruled in part**.

## I.    BACKGROUND

This case is a products liability matter involving defective artificial hip implants and was originally filed as part of a multidistrict litigation ("MDL"). (Doc. 321, at 4, 7). Defendant is comprised of several corporations that design, manufacture, market, promote, and sell medical devices. (*Id.*, at 4). Defendant designed, manufactured, marketed, promoted, and sold an artificial hip implant known as the Biomet M2a Magnum Hip System ("M2a Magnum"). (*Id.*). Lori Nicholson ("plaintiff")[3] is one of thousands of individuals who received an M2a Magnum artificial hip implant, which she received to remedy severe pain she had in her natural hip. (*Id.*, at 5). Plaintiff experienced no complications during her hip replacement surgery, which was performed by Dr. Emile Li ("Dr. Li") on July 10, 2007, and had no complaints immediately after the surgery. (*Id.*, at 5–6). Indeed, plaintiff did not experience hip pain from 2008 to 2011, and she was able to return to normal activities and to her job. (*Id.*, at 6). In late 2011, however, plaintiff's hip pain returned, and she again sought Dr. Li's medical help. (*Id.*). Based on his observations, Dr. Li concluded that a part of plaintiff's M2a Magnum hip implant "had migrated to a vertical orientation." (*Id.*). Specifically, Dr. Li found that plaintiff had a "loose acetabular component status post left total hip." (*Id.*). Dr. Li performed a revision surgery to correct the loose component. (*Id.*). There were no complications during the surgery during which Dr. Li replaced the M2a Magnum implant with a metal-on-polyethylene ("metal-on-poly") implant, also manufactured by Biomet; the new implant appears to have been successful. (*Id.*).

---

[3] Plaintiff's husband, Willis, was originally a party to this action and raised a loss of consortium claim. During trial, plaintiff's counsel notified the Court that Willis was no longer pursuing his loss of consortium claim.

A nine-day jury trial was held from November 9, 2020, to November 20, 2020. (Docs. 396 & 418). The jury was instructed to consider plaintiff's design defect claim. (Doc. 397, at 21). Before the case was submitted to the jury, defendant moved for judgment as a matter of law on the design defect claim. (Doc. 407). The Court denied the motion. (*Id.*). The case was then submitted to the jury. The jury returned a verdict in favor of plaintiff and awarded plaintiff $1,050,000 in compensatory damages and $2,500,000 in punitive damages. (Doc. 419).

## II.    RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant renews its motion for judgment as a matter of law on plaintiff's design defect claim and on plaintiff's request for punitive damages. (Doc. 431, at 7). Defendant makes numerous arguments in support of its motion, several of which overlap with arguments it makes in its motion for a new trial. First, defendant argues plaintiff's design defect claim fails as a matter of law because plaintiff "failed to offer sufficient evidence to permit a reasonable jury to conclude that the M2a Magnum's design was defective." (*Id.*, at 11). Second, defendant argues plaintiff "failed to offer sufficient evidence to permit a reasonable jury to conclude that an alleged design defect in the M2a Magnum caused [plaintiff's] injuries." (*Id.*, at 17). Third, as to the punitive damages, defendant asserts plaintiff's punitive damages request fails because plaintiff "failed to offer sufficient evidence to permit a reasonable jury to conclude that an award of punitive damages was merited." (*Id.*, at 28). The Court will discuss the applicable law and then address each of these issues in turn.

### A.    Applicable Law

Rule 50 of the Federal Rules of Civil Procedure establishes the standard for a court to grant a motion for judgment as a matter of law. It provides, in pertinent part:

**(a) Judgment as a Matter of Law.**
(1) In General. If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally

6

sufficient evidentiary basis to find for the party on that issue, the court may:

> (A)    resolve the issue against the party; and

> (B)    grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

> (2) Motion.  A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

> **(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.**  If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may:
>> (1) allow judgment on the verdict, if the jury returned a verdict;
>> (2) order a new trial; or
>> (3) direct the entry of judgment as a matter of law.

FED. R. CIV. P. 50(a)–(b).  In ruling on a motion under Rule 50, a court must draw all reasonable inferences in favor of the nonmoving party.  *Roberson v. AFC Enters., Inc.*, 602 F.3d 931, 933 (8th Cir. 2010); *Canny v. Dr. Pepper/Seven–Up Bottling Grp., Inc.*, 439 F.3d 894, 900 (8th Cir. 2006).  A court must deny a motion for judgment as a matter of law if it concludes that reasonable jurors could draw different conclusions based on the evidence.  *Roberson*, 602 F.3d at 933.  A court must also "give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts." *Neely v. Am. Family Mut. Ins. Co.*, 930 F. Supp. 360, 368 (N.D. Iowa 1996) (quoting

7

*Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir. 1991). In other words, a court ruling on a renewed motion for a judgment as a matter of law, must

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Stults v. Am. Pop Corn Co.*, 815 F.3d 409, 418 (8th Cir. 2016) (quoting *Jones v. Edwards*, 770 F.2d 739, 740 (8th Cir. 1985)). In drawing all reasonable inferences in favor of the nonmoving party, a court must "not make credibility determinations or weigh the evidence." *Meyers v. Starke*, 420 F.3d 738, 741 (8th Cir. 2005).

The Eighth Circuit has repeatedly stated that "[j]udgment as a matter of law is appropriate only when the record contains 'no proof beyond speculation to support the verdict.'" *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 462 (8th Cir. 2013) (quoting *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 770 (8th Cir. 2004) (additional citations omitted); *see also Arabian Agric. Servs. Co. v. Chief Indus., Inc.*, 309 F.3d 479, 482 (8th Cir. 2002). In sum, judgment as a matter of law "is appropriate 'when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party.'" *Hortica–Florists' Mut. Ins. Co. v. Pittman Nursery Corp.*, 729 F.3d 846, 854 (8th Cir. 2013) (quoting *Ehrhardt v. Penn Mut. Life Ins. Co.*, 21 F.3d 266, 269 (8th Cir. 1994)). On the other hand, "'[a] mere scintilla of evidence is inadequate to support a verdict' and judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support the verdict." *Clark v. Kan. City Mo. Sch. Dist.*, 375 F.3d 698, 701 (8th Cir. 2004) (quoting *Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996)).

**B.    Design Defect**

At trial, when the Court denied defendant's motion for judgment as a matter of law on plaintiff's design defect claim, the Court acknowledged defendant put on evidence that was favorable to its case. Nevertheless, the Court determined that plaintiff, viewing the record in the light most favorable to her, presented sufficient evidence such that a reasonable jury could find that the device was defectively designed and a reasonable alternative design was available at the time of her implantation with the M2a Magnum. Here, the Court affirms its position that there was more than a mere scintilla of evidence supporting plaintiff's design defect claim. Thus, the Court finds it would be inappropriate to reverse the jury's finding. *See Kelly v. Armstrong*, 206 F.3d 794, 797 (8th Cir. 2000) (noting that the court is "very reluctant to set aside a jury's verdict and will not do so lightly").

For the jury to find for plaintiff on her design defect claim, it had to find the following elements:

1. The defendant sold or distributed the M2a-Magnum;
2. The defendant was engaged in the business of selling or distributing the M2a-Magnum;
3. The product was in a defective condition at the time it left defendant's control because of a defect in its design;
4. A reasonable alternative safer design could have been practically adopted at the time of sale or distribution;
5. The alternative design would have reduced or avoided the foreseeable risks of harm posed by the M2a-Magnum;
6. The reasonable alternative design renders the M2a-Magnum not reasonably safe;
7. The alternative design would have reduced or prevented the plaintiff's harm;
8. The design defect was a cause of plaintiff's damage; and
9. The amount of damage.

(Doc. 397, at 21). Plaintiff was required to prove each of the above elements by a preponderance of the evidence. (*Id.*, at 20). The parties stipulated that plaintiff proved

9

elements one and two by a preponderance of the evidence and defendant does not challenge the jury's finding on those two elements. Defendant does, however, challenge the remaining elements because it asserts there was not enough evidence for a reasonable jury to conclude there was a design defect, that plaintiff failed to meet her burden in proving that there was a reasonable alternative design, and there was not sufficient evidence for a reasonable jury to find the design defect caused plaintiff's injury. The Court will consider the evidence of a design defect and a reasonable alternative design before it turns to the causation evidence. Viewed in the light most favorable to the non-moving party, the Court finds there was evidence from which a reasonable jury could find that the M2a Magnum was defectively designed, there was a reasonable alternative design available, and that the defective design caused plaintiff's injury.

### 1.    *Evidence of Design Defect*

For defendant to be found liable for the design defect claim, plaintiff had to prove by a preponderance of the evidence that the product was in a defective condition at the time it left defendant's control because of a defect in its design. (*Id.*, at 21).

Defendant alleges that plaintiff failed to prove the design of the M2a Magnum was defective. (Doc. 431, at 11). Defendant argues that plaintiff only offered generic evidence of a design defect and that none of the expert witnesses offered testimony criticizing the specific design of the M2a Magnum. (*Id.*, at 13). Defendant also alleges that not a single orthopedic expert testified that the M2a Magnum was defective at trial. (*Id.*). Last, defendant also argues that there were varying opinions within the orthopedic industry in 2007 regarding the best option for total hip replacements. (*Id.*, at 15).

It is the jury's responsibility to determine what evidence and testimony to believe and what evidence and testimony to not believe. It is also the jury's responsibility to consider the totality of the evidence and make its decision based on all the evidence that

is presented to it. At trial, several of plaintiff's witnesses gave testimony that supports the jury's verdict finding defendant liable on the design defect claim.

First, plaintiff's general causation expert Dr. George Kantor ("Dr. Kantor") testified that all metal-on-metal hip replacements are defective in design the moment they are sold. Dr. Kantor also testified that metal-on-metal hips cause problems such as damage to tissue, loosening of the cup component, pain, and metallosis. Second, plaintiff's expert witness Mari Truman ("Truman") discussed the M2a Magnum. Truman did not examine the specific M2a Magnum device that had been implanted in plaintiff, but she discussed the design risks of the M2a Magnum generally and concluded that the M2a Magnum's large head size generates more metal debris which leads to more metal ions and risk to patients. Third, Dr. Steven Naide ("Dr. Naide") testified about his examination of other devices and the impact of metallosis on a patient. Last, Dr. Li testified about what he observed when he performed plaintiff's revision surgery, which a reasonable jury could find showed damage from metal ions. If the preponderance of the evidence standard required any single witness to connect all the dots of evidence to sufficiently establish design defect, the Court would be skeptical that any of the witnesses had done that. The jury, however, considers the totality of the evidence, and the multiple witnesses who respectively testified about general metal-on-metal harms, harms unique to M2a Magnum devices, and observations about plaintiff's condition. A reasonable jury could connect these evidentiary dots to find for plaintiff on this issue.

Thus, considering the totality of the evidence, the Court finds there was sufficient evidence of a design defect to support the jury's verdict and **denies** defendant's renewed motion for judgment as a matter of law as it relates to this issue.

### 2. *Reasonable Alternative Design*

To prove her design defect claim, plaintiff also had to show a reasonable alternative design could have been practically adopted at the time of the sale or

distribution, which was 2007 here. (Doc. 397, at 21). Defendant acknowledges that there was at least one other alternative device on the market in 2007, which was a metal-on-poly hip implant, but argues that the metal-on-poly design had its own unique issues, would not have reduced plaintiff's injuries, and that there was disagreement in the medical field about which device was superior. (Doc. 431, at 13).

Evidence was produced at trial that could lead a reasonable jury to conclude that there was a reasonable alternative design available in 2007 that would have reduced plaintiff's injury and need for revision surgery. Specifically, Truman testified that Biomet's metal-on-poly device, the ArCom, was available as early as 1995 and that, in her opinion, it was a better and safer alternative to the metal-on-metal design. Dr. Kantor also testified that the metal-on-poly design was safer and was available as early as 1998. Last, Dr. Naide also testified that metal-on-poly was a reasonable, safer design and could have been practicably adopted in 2007. Thus, there were three witnesses who all testified that there was a reasonable alternative design. Defendant is correct that there was disagreement about the benefits and efficacy of different hip implant designs in 2007, that metal-on-poly devices also had some potential issues, and some professionals argued that metal-on-metal was superior. This was all counter-evidence that the jury was free to consider, but it does not negate the fact that three of plaintiff's witnesses gave contrary testimony that the jury was also allowed to consider. After considering all the evidence, the jury determined the metal-on-poly was a reasonable alternative design that was available and would have reduced plaintiff's injury. It was within the jury's purview to weigh the evidence in this manner.

Thus, considering the totality of the evidence, the Court finds there was sufficient evidence of an available reasonable alternative design that would have reduced plaintiff's injuries to support the jury's verdict and **denies** defendant's renewed motion for judgment as a matter of law as it relates to this issue.

12

### 3. Causation

Defendant next argues that judgment as a matter of law should be granted in its favor because plaintiff "failed to offer sufficient evidence to permit a reasonable jury to conclude that an alleged design defect in the M2a Magnum caused [plaintiff's] injuries." (Doc. 431, at 16). According to defendant, "[m]edical device product defect cases require case-specific expert testimony because they raise causation issues that are beyond the knowledge of a layperson." (*Id.*). Defendant argues that the causation testimony that came out at trial through Dr. Naide and Dr. Li was inadmissible and without it there was no other causation testimony or evidence.

Defendant's arguments to exclude Dr. Naide's and Dr. Li's testimony are largely the same as the arguments it makes in support of its motion for a new trial. The Court discusses those arguments fully in a subsequent section alongside additional arguments to exclude other witnesses' testimony. Thus, it need not also elaborate on the arguments here. For purposes of this motion, however, the Court finds that both Dr. Naide's and Dr. Li's causation testimony was admissible. Given the admissibility of their causation testimony, there was sufficient evidence from which a reasonable jury could find that the M2a Magnum caused plaintiff's injury. Thus, considering the totality of the evidence, the Court **denies** defendant's renewed motion for judgment as a matter of law as it relates to this issue.

### C. Punitive Damages

Defendant claims there was insufficient evidence in the record to support the jury's punitive damages award. (Doc. 431, at 27).

Under Iowa law,[4] there is no separate cause of action for punitive damages. *Burke v. Deere & Co.*, 6 F.3d 497, 511 (8th Cir. 1993). "Only evidence which is relevant to

---

[4] Defendant argues that Indiana law should apply to the punitive damages claim. (Doc. 431, at 27 n.15). The parties discuss this point more fully in their briefs relating to the motion for a

the conduct for which liability is imposed can support an award of punitive damages."
*Id.* To support a punitive damage award there must be clear, convincing, and satisfactory evidence of "willful and wanton disregard for the rights of another." *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 594 (Iowa 1999). "Conduct is willful and wanton when the actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm will follow." *Burke*, 6 F.3d at 511 (citing *Larson v. Great W. Cas. Co.*, 482 N.W.2d 170, 174 (Iowa Ct. App. 1992)).

Consistent with Iowa law, the Court instructed the jury that if they found in favor of plaintiff and against defendant on the design defect claim they should consider whether punitive damages were appropriate. (Doc. 421, at 5). The Court's jury instruction, in pertinent part states:

> Punitive damages may be awarded if the plaintiff has proven by a preponderance of clear, convincing, and satisfactory evidence the defendant's conduct constituted a willful and wanton disregard for the rights or safety of another and caused actual damage to the plaintiff. Punitive damages are appropriate when the defendant acted with "legal malice" which may be shown by wrongful conduct committed with a willful or reckless disregard for the rights of another. Punitive damages are not intended to compensate for injury but are allowed to punish and discourage the defendant and others from like conduct in the future. You may award punitive damages only if the defendant's conduct warrants a penalty in addition to the amount you award to compensate for plaintiff's actual injuries.

(*Id.*). The Court also instructed the jury:

> Evidence is clear, convincing, and satisfactory if there is no serious or substantial uncertainty about the conclusion to be drawn from it.

---

new trial. Thus, the Court will address the arguments more fully below, but in short, finds Iowa law should apply to the punitive damages claim.

Conduct is willful and wanton when a person intentionally does an act of an unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow.

(*Id.*, at 6).

Plaintiff cites several pieces of evidence that she claims supported the punitive damages award and specifically, that defendant "was aware of the defects or potential defects in metal-on-metal hips, yet knowingly and intentionally persisted in a course of conduct despite continuously being made aware of its harmful consequences." (Doc. 444, at 33). First, through Truman's testimony, plaintiff demonstrated willful disregard of known risks. (*Id.*). For example, Truman discussed the Amstutz consensus paper which found that there needed to be additional preclinical testing and analysis of retrieved devices. (*Id.*). Truman also discussed a letter from a Dr. Hozack in which Dr. Hozack warned defendant of his concerns about the negative effects of metal ion release and that defendant did not have any plan to deal with the problem. Truman testified that despite being alerted to these concerns, defendant failed to address them. (*Id.*). Second, plaintiff introduced an email from a corporate witness that instructed employees to develop a product that will make the most money for defendant and to push the project to completion as soon as possible to benefit the company's bottom line. (*Id.*, at 34). In another email, a corporate representative responded to a concern about metal ion release data by saying "[t]his could be [sic] sales to halt." (*Id.*, at 35). In a third email, a representative who helped design the M2a Magnum expressed his concern about metal ions and stated that he was concerned about the sales response and the potential for medical malpractice. (*Id.*). According to plaintiff, each of these emails shows defendant was aware of the safety risks with the M2a Magnum but chose to disregard them and put sales ahead of safety. (*Id.*, at 35–36).

The Court finds that, in light of the evidence presented at trial, there was sufficient evidence to support a punitive damages award. As the Court noted in response to

defendant's oral motion for judgment as a matter of law during trial, this is not a case where the willful and wanton conduct of an unreasonable character related to deciding to design a metal-on-metal hip. The basis for punitive damages was that they introduced the M2a Magnum to the market when it should have stayed in research and design until defendant was sure it was safe to be presented to the market. Truman's testimony and her reference to several studies that were concerned with inadequate testing is evidence that there was insufficient testing performed despite known safety risks. The emails could also be understood to mean that defendant knew of the risks with metal ions but decided to place sales above further study and to disregard safety in favor of the company's bottom line. Based on this evidence, a reasonable jury could find that there was an intentional disregard of a known risk that made it likely harm would follow. Defendant asserts that because there is contrary evidence that the M2a Magnum was not defective, it "demonstrates that [defendant] did not intentionally disregard the safety of another." (Doc. 431, at 28). The Court disagrees. It shows that there is contrary evidence, but nothing more. It is not up to the Court to determine which evidence was stronger; it is only the Court's responsibility to determine whether there was sufficient evidence to support the jury's verdict. As outlined above, there was sufficient evidence here.

Defendant argues that because the Court found the warnings on the M2a Magnum were adequate as a matter of law, it cannot be liable for punitive damages. (Doc. 431, at 30). Defendant asserts that because it warned plaintiff of the exact type of harm plaintiff suffered here, it shows defendant could not have acted with willful and wanton conduct. (Id.). In other words, by including warnings, defendant essentially assumes it was absolved of wrongdoing.

The Court finds the adequacy of the warnings does not negate the possibility of collecting punitive damages on a design defect. To hold as much would run counter to the objectives of product liability and tort law of reducing risk and associated costs.

16

Indeed, it would remove any burden on designers or manufacturers to design a safe product if they could simply slap a warning on any product. It would allow them to disregard any known defects and not improve their design because they know they would not be held liable so long as they included a warning. Thus, a warning included with the product, even if it warns of the type of damage actually suffered, does not eliminate punitive damages as a matter of law.

Defendant cites three cases to support its argument that an adequate warning negates a punitive damages award as a matter of law. (Doc. 431, at 30) (citing *Lockley v. Deere & Co.*, 933 F.2d 1378 (8th Cir. 1991); *Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496 (8th Cir. 1993); *Richetta v. Stanely Fastening Sys., L.P.*, 661 F. Supp. 2d 500 (E.D. Pa. 2009)). Although two of the cases are from the Eighth Circuit, none of them apply Iowa law but instead apply Arkansas, Missouri, and Pennsylvania law, respectively and thus, are not binding. Defendant assumes Iowa would follow the same principles but does not support its assumption with any cases.

Also, in each of the cases cited by defendant, there was a significant undertaking to remedy the previous defect. For example, *Lockley v. Deere & Co.*, 933 F.2d 1378 (8th Cir. 1991), involved an auger manufactured and sold by Deere and Company ("Deere"). *Id.* at 1380. After several accidents involving the auger occurred, Deere started putting warning labels on the augers, sent warning labels to customers who purchased augers before the labels were attached, and undertook a field modification campaign to improve the augers' safety features. *Id.* at 1390. Similarly, in *Drabik v. Stanley-Bostitch, Inc.*, the defendant manufacturer, upon learning of accidents involving its products, "immediately took steps to make the product safer," including changing the design and including specific and explicit warnings on the product. *Id.* at 510. The *Drabik* court found those actions were inconsistent with a company that was completely indifferent to the safety of others. *Id.*

Here, there is only evidence that defendant included warnings on the product, not that it sought to redesign the product or take other actions once it discovered a safety issue. This is an important distinction. When a company makes revisions and issues new warnings after learning of several accidents, it does so at great expense to production and reputation. The same expense is not incurred simply by placing a warning label on a product. To be sure, not every product with a warning on it is defectively designed. That said, a warning alone does not cure a product's defects and does not inherently preclude a finding of wanton disregard for safety even if it is evidence to the contrary.

Further, this case is distinguishable from the cases upon which defendant relies because the danger posed by the product defect in those cases arose as a result of the customer's conduct; if warned to avoid the conduct, it could negate the danger posed by the defect. For example, the danger with the auger arose when farmers attempted to clean the auger before turning if off. Here, the danger posed by defendant's product was not dependent on the customer's conduct. In other words, there was nothing that plaintiff could be warned of that, had she heeded the warning, it would have negated the impact of the design defect. Rather, the warning here is akin to simply stating that we have made a dangerous product and if you buy it, then you assume the risk. In short, the Court is unpersuaded by the cited cases.

Thus, the Court **denies** defendant's motion for judgment as a matter of law on the issue of punitive damages.

### D. Conclusion

For these reasons, the Court finds there was sufficient evidence of design defect, reasonable alternative design, causation, and willful and wanton conduct to support the jury's verdict. Thus, the Court **denies** defendant's renewed motion for judgment as a matter of law (Doc. 427) on each of the grounds raised in their motion.

18

### III.  DEFENDANT'S MOTION FOR A NEW TRIAL

Defendant also moved for a new trial under Federal Rule of Civil Procedure 59 in conjunction with its Rule 50 motion.  (Doc. 425).  Defendant argues it is entitled to a new trial because "the first trial, through a verdict against the weight of the evidence, an excessive damages award, and legal errors at trial, resulted in a miscarriage of justice." (*Id.*, at 2).

### A.  Applicable Law

Federal Rule of Civil Procedure 50(c) states that "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted in event the judgment is later vacated or reversed."  Rule 59(a) states:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

The Eighth Circuit has held that "[a] motion for a new trial based on sufficiency of the evidence should be granted only 'if the verdict is against the weight of the evidence and allowing it to stand would result in a miscarriage of justice.'"  *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 552–53 (8th Cir. 2013) (quoting *Shaw Grp., Inc. v. Marcum*, 516 F.3d 1061, 1067 (8th Cir. 2008)).  In reviewing Rule 59 motions, unlike Rule 50 motions, "the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'"  *Waitek v. Dalkon Shield Claimants Tr.*, 934 F. Supp. 1068, 1092 (N.D. Iowa 1996) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)).

Under Rule 59(a)(1)(A) "[a] new trial is [also] appropriate when the first trial, through . . . an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice."  *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996).  Not every error

requires granting a new trial and the "key question is whether a new trial should have been granted to avoid a miscarriage of justice." *Bass v. Gen. Motors Corp.*, 150 F.3d 842, 845 (8th Cir. 1998). Even when individual errors are deemed harmless, their cumulative effect may result in an unfair trial. *Williams v. City of Kansas City*, 223 F.3d 749, 755 (8th Cir. 2000).

## B. Against the Weight of the Evidence

As the Court discussed above in its analysis on the renewed motion for judgment as a matter of law, there was sufficient evidence to sustain the jury's verdict. The Court has already extensively discussed examples of the evidence that supported the jury's verdict and the Court need not repeat the evidence here. Even though a Rule 59 motion allows the Court to rely on its own reading of the evidence, there was nothing in the evidence that caused the Court to disbelieve witnesses or evidence to the extent it would greatly affect the analysis and substantially shift the weight of the evidence. Because there was sufficient evidence to sustain their verdict, the verdict was not against the great weight of the evidence and allowing it to stand would not result in a miscarriage of justice. *See Bennett*, 721 F.3d at 552–53.

## C. Legal Errors at Trial

### 1. Allowing plaintiff to introduce unrelated second-generation metal-on-metal devices and post-sale evidence, but preventing defendants from presenting evidence to distinguish the M2a Magnum from other second-generation devices

Defendant includes several sub-arguments—and sub-sub-arguments—under its general argument that the Court erred in allowing plaintiff to introduce evidence of unrelated second-generation metal-on-metal devices. First, defendant argues that the Court unevenly applied its ruling that post-sale evidence could be used to prove causation by: 1) permitting plaintiffs to introduce extensive post-sale evidence, including post-sale evidence of other second-generation metal-on-metal devices, to prove causation; and

20

2) not permitting defendant to rebut, clarify, or complete the evidence offered by plaintiffs. (Doc. 430, at 14–17). Second, defendant argues the Court erred in permitting plaintiffs to offer evidence of data, rates, and opinions regarding other second-generation metal-on-metal implants to attempt to prove causation. (*Id.*, at 17–19). Third, defendant argues the Court erred in permitting plaintiffs to use post-sale data, rates, and opinions to attempt to demonstrate an alleged design defect. (*Id.*, at 19–21). Fourth, defendant argues the Court erred in precluding defendant from offering evidence to rebut, complete, or clarify plaintiff's evidence. (*Id.*, at 21–22). Fifth, defendant argues the Court erred in precluding defendant from offering evidence of actual use to defend its design. (*Id.*, at 22–24).

In the Court's rulings leading up to and during trial, the Court had to rule on the admissibility of post-2007 evidence numerous times. In ruling on post-2007 evidence, the Court drew an important distinction between post-2007 evidence that was used to show design defect and post-2007 evidence that was used to show the M2a Magnum caused plaintiff's injury. As the Court reiterated throughout trial, this distinction was important. The Court reasoned that post-2007 evidence could not be used to show the product was defectively designed because it would be unfair, for example, to show that there was a 2009 study explaining that metal-on-poly was a reasonable alternative design. Nobody in 2007 could have relied on the 2009 study because it did not exist yet. Post-2007 evidence could be relevant, however, to show causation. For example, there were medical records from post-2007 that showed plaintiff had elevated levels of metal ions and a pseudocyst that was evidence of the cause of the hip loosening. There of course is no way this could have been known before the hip was implanted in 2007 because the implant resulted in these problems. The Court also reasoned that within the medical field it sometimes takes time for problems to develop and for studies to be conducted and

reported. For instance, if a study was written in 2013 after data developed regarding the impact of metal ions from hip implants, that could be admissible as to causation.

The Court also drew another line regarding the evidence of how products performed historically. The Court barred admission of gross statistics by either side, meaning the use of databases, for example, to suggest that the product did or did not perform well over time. The Court generally barred that evidence because the source of the data was not shown to be in all cases similar to the facts of this case such that the Court had confidence that the data was reliable.

After reviewing the arguments and considering the issues outside the constraints of trial, the Court finds there is still an important distinction between evidence used to show causation and evidence used to show design defect, and thus, the Court did not err in drawing that distinction. The Court maintains this ruling for the same reasons.

In light of the Court's finding that there is a distinction between causation evidence and design defect evidence, the Court reviewed the instances raised by defendant in which it asserts the Court should not have admitted certain pieces of evidence. In reviewing the statements defendant includes in its post-trial briefing as the instances of statements, data, and opinions regarding other metal-on-metal hips that were admitted at trial, the Court finds it generally did not err.

The Court need not go through the evidence piece by piece here but can instead rely on several general points. First, the Court largely did maintain the distinction between post-2007 evidence that was used to show causation versus evidence that was used to show design defect. Most of the evidence defendant complains of—including testimony from Dr. Kantor, Dr. Naide, Dr. Li, and Truman—directly related to and supported causation. For example, defendant asserts Dr. Kantor should not have been permitted to testify that 50% to 70% of metal-on-metal devices result in adverse metal reaction. As the Court explained at trial, however, these rates were not gross statistics

22

on revision rates, but were limited to a specific type of reaction to metal ions. This gets directly at causation because metal ions were the alleged cause of plaintiff's injuries here. Thus, the testimony was not about the general design defects of metal-on-metal hips, but was instead about the general effects of metal-on-metal hips.

Second, the Court generally adhered to its ruling that gross statistics could not be used to show causation or design defect. Defendant asserted several times during trial that it wanted to introduce evidence of the MAUDE database to show that actual revision rates indicate that the device was not defective. The problem with gross statistics about revision rates, however, is it goes to information derived later about defective design. Aside from the problems with the MAUDE database reporting requirements, it did nothing to show causation. Indeed, that only one revision was reported to the MAUDE database does nothing to show that metal ions do not cause loosening of the devices.

Third, the Court sustained objections and gave a limiting instruction when the lines started to blur between causation and design defect. For example, when Dr. Naide gave testimony that he had implanted 175 metal-on-metal devices that were not involved in this litigation and revised between 75-100, defendant objected, and the Court sustained the objection. In another instance, the Court gave a limiting instruction in which it told the jury that post-2007 evidence could only be considered for causation and not design defect. Jurors are presumed to follow all instructions, including limiting instructions, and the Court assumes they did so here. *See United States v. Blumeyer*, 62 F.3d 1013, 1017 (8th Cir. 1995). Thus, to the extent post-sale evidence was admitted that could have been considered for both design defect and causation, the Court limited the evidence to causation when defendant objected.

Last, defendant was given an opportunity to present evidence that distinguished the M2a Magnum from other metal-on-metal devices. For example, David Schroeder was permitted to talk about all the benefits of magnum devices and how they differed

23

from other metal-on-metal devices generally. Thus, the Court disagrees with defendant's assertion that it was precluded from presenting evidence distinguishing the M2a Magnum from other devices.

For these reasons, the Court finds it generally applied its rulings evenly and properly limited post-2007 evidence to causation evidence.

### 2. *Refusing to instruct the jury that defendant's warnings were adequate as a matter of law*

Defendant next argues that the Court erred in refusing to instruct the jury that defendant's warnings and instructions for use were adequate as a matter of law and in permitting plaintiff to argue about warnings despite judgment being entered against her on her failure to warn claims. (Doc. 430, at 24).

Defendant first argues that the "Court should require a new trial because Plaintiffs were permitted to present a failure-to-warn theme throughout . . . trial." (*Id.*). The Court finds that defendant is overstating the testimony relating to warnings. The Court does not interpret any of the statements defendant complains of to be related to a failure to warn. For example, defendant states that during opening statements plaintiff's counsel argued that defendant sold surgeons a false bill of goods. This statement is more accurately interpreted as a general statement that the orthopedic community was told about the general benefits and properties of the device, it does not relate to the specific warnings defendant did or did not provide. Even if this comment in combination with several other similar comments could be interpreted as relating to the warnings, it was far from a theme of the trial. Nor is there any evidence that it was the result of an attempt by plaintiff to introduce impermissible evidence. At most, these were passing references involving general statements that could vaguely relate to warnings.

Defendant next argues that the Court committed instructional error by eliminating one of the factors for the jury to evaluate reasonable alternative design. (*Id.*, at 26).

24

According to defendant, "the instructions and warnings accompanying the product" was a factor the jury could have considered in evaluating reasonable alternative design and the Court erred by omitting it. (*Id.*).

The Court agrees that it was one of the factors the Court could have instructed the jury to consider, but also finds that it was not required to. A district court has broad discretion in formulating jury instructions and does not have to give the precise instructions set out in the state's model instructions. *Brown v. Sandals Resorts, Int'l*, 284 F.3d 949, 953 (8th Cir. 2002); *see also Porchia v. Design Equip. Co., a Div. of Griffith Labs.*, 113 F.3d 877, 883 (8th Cir. 1997). Also, the jury instructions are required to "fairly and adequately represent the evidence and appliable law in light of the issues presented to the jury in a particular case." *Am. Bank of St. Paul v. TD Bank, N. Am.*, 713 F.3d 455, 467–68 (8th Cir. 2013).

Here, the Court excluded any reference to warnings and instructions from the jury instructions because they were in no way part of this case. Indeed, the Court ruled on those claims long before trial. Thus, they were irrelevant to any issue in this case. Also, the Court found that including the instructions would have been confusing and unduly prejudicial because it would be introducing an additional topic on which there was no evidence. Indeed, because the Court granted summary judgment in favor of defendant on the inadequate warnings claim, plaintiff was barred from offering evidence about the adequacy of the warnings. Further, this case did not involve a product defect that, if a customer was provided with proper instructions or warnings, could render use of the product safe. Thus, because the instructions and warnings were not part of the trial, the Court finds it did not err in excluding that portion of the jury instructions. The remaining instruction still accurately reflects the law.

### 3.    *Admitting Dr. Naide's causation opinions*

Defendant argues that Dr. Naide's causation opinions should not have been permitted at trial under Federal Rule of Evidence 702 "because they were premised on an unreliable differential diagnosis." (Doc. 430, at 27).  According to defendant, Dr. Naide did not properly "rule out patient factors, such as [plaintiff]'s revision surgery" and that the methodology he used to reach his causation opinions "required ignoring the evidence contained in his reliance materials, his professional affiliates' publications, and his own standards of practice." (*Id.*, at 27–28).

In the Court's summary judgment and *Daubert* order, the Court found that Dr. Naide relied on an acceptable methodology to reach his conclusions. (Doc. 321, at 13–16).  Specifically, the Court found that Dr. Naide's extensive experience performing thousands of joint replacements and hundreds of revisions allowed him to draw conclusions based on his review of plaintiff's medical records, testimony from other experts, and relevant literature. (*Id.*).  The Court also found that Dr. Naide conducted a satisfactory differential diagnosis in which he ruled in and ruled out potential causes of the injury. (*Id.*, at 16–17).

Nothing presented at trial has changed the Court's findings.  Indeed, the evidence presented at trial confirms its findings.  At trial, Dr. Naide explained the materials he examined in preparing his opinions, including reviewing plaintiff's medical records, her deposition, and Dr. Li's deposition.  Dr. Naide considered all this information in light of his own extensive personal experience as a physician.  Dr. Naide then explained to the jury what he observed in the medical records and his understanding of how the treatment proceeded based on the records and Dr. Li's notes.  He then ruled in and ruled out other potential causes of the revision for the jury.  For example, Dr. Naide explained that there was no evidence of delayed wound healing and that he did not see any cracks in the medial wall.  Dr. Naide may not have explained every possible alternative cause, but he

was not required to. Indeed, there is no requirement that an expert eliminate every other explanation before the expert is permitted to explain his or her opinions. *Farm Bureau Prop. & Cas. Ins. Co. v. CNH Indus. Am. LLC*, No. C16-3122-LTS, 2018 WL 2077727, at *7 (N.D. Iowa Feb. 5, 2018).

Defendant's argument that Dr. Naide's testimony should be excluded because the methodology he used to reach his opinions ignored evidence contained in his reliance materials, his professional affiliate publications, and his own standards of practice is unavailing. If Dr. Naide did come to different conclusions than those found in other publications or were against his standard of practice, defendant was perfectly free to elicit testimony on that topic during cross examination. Defendant did exactly that at trial when they asked Dr. Naide extensively about his methodology, his observations, and other potential causes. A motion for a new trial after the trial has concluded is not intended to be a substitute for cross examination that should have, and indeed did occur, at trial.

Thus, the Court declines to overrule its previous rulings on Dr. Naide's testimony and finds it was permissible causation testimony.

### 4. Dr. Li's new, undisclosed opinions regarding causation and future damages
#### a. Exceeded scope of non-retained treating physician

Defendant first argues that "Dr. Li's causation and future damages opinions should have been excluded because they exceeded the scope of his disclosed opinions as a non-retained treating physician." (Doc. 430, at 29). Defendant takes issue with two categories of evidence that allegedly exceed the scope of a treating physician and were not disclosed. First, that metallosis caused plaintiff's injury and second, that plaintiff will need additional revisions in the future.

Generally, if a treating physician limits his or her testimony to the patient's care, then the physician is not a specially retained expert under Rule 26. *Smith v. Bankers Life and Cas. Co.*, No. 3:05-CV-00130-RP-TJS, 2008 WL 2845080, at *5 (S.D. Iowa Jan.

30, 2008). "A treating physician may testify about information which is related to and learned through actual treatment of the patient, and which is based on his or her personal knowledge of the examination, diagnosis and treatment." *Id.* "Furthermore, 'the treating physician for whom no expert report is supplied is not permitted to go beyond the information acquired or the opinion reached as a result of the treating relationship to opine as to the causation of any injury.'" *Allen v. C.R. Bard, Inc.*, No. 11-cv-2031-LRR, 2017 WL 4127765, at *2 (N.D. Iowa Sept. 15, 2017) (quoting *Lorenzi v. Pfizer, Inc.*, 519 F. Supp. 2d 742, 750 n.6 (N.D. Ohio 2007)). That is not to say, however, that a treating physician is entirely precluded from testifying about causation opinions if those opinions were formed during the course of treatment. *See id.* (citing *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 604 (N.D. Fla. 2009) ("[T]reating physicians may offer medical opinion regarding their care and treatment of a patient, including their diagnoses of a patient's medical conditions and causes of those conditions, without production of an expert report.").

Given the applicable legal standards, the issue of Dr. Li's causation testimony turns on whether he reached his opinion as a result of the treating relationship, or whether he went beyond that information. The Court finds that Dr. Li's trial testimony was based on the opinions he formed as a treating physician and were not reached by going beyond the information he acquired in that role. At trial, Dr. Li was asked by plaintiff's counsel about metallosis, and specifically, whether Dr. Li believed plaintiff had metallosis. (Doc. 451, at 198). Dr. Li answered that metallosis involves a patient having elevated metal ions in their body and that he believed plaintiff had metallosis. (*Id.*). Dr. Li also testified that, based on his observations as the treating physician, it was his belief the metal ions caused the loosening of the cup. Dr. Li then testified that the metallosis, loosening of the cup, pseudocyst, and pain all caused him to believe the M2a Magnum had failed. (*Id.*, at 198–99). Nothing in this testimony indicates Dr. Li was linking the M2a

28

Magnum's design to plaintiff's injury. Nor is there anything that indicates he considered material other than his own experience treating plaintiff in reaching his conclusion. Rather, Dr. Li considered his experiences as the treating physician and then linked the type of injury plaintiff suffered with the type of injury that occurs when there are metal ions in the body, which come from defective hip implants. Not only did Dr. Li's testimony "naturally flow[ ]" from his care of plaintiff, it was the direct result of it. *See Boyd v. Mabey*, No. 3:06-CV-470, 2009 WL 10675317, at *2 (E.D. Tenn. Mar. 16, 2009). Thus, Dr. Li's testimony was based on the treatment he provided to plaintiff and was permissible without production of an expert report.

Alternatively, defendant also argues that Dr. Li's causation testimony at trial was contrary to what he had previously stated. Specifically, defendants state that Dr. Li previously testified in 2016 that he could not determine the cause of the loosening and that plaintiff did not exhibit metallosis in her hip at the time of the revision. (Doc. 430, at 30). If Dr. Li provided different testimony during his deposition than he did at trial, the remedy is not to grant defendant a new trial. The proper remedy for inconsistent testimony is rigorous cross examination that either casts doubt on the credibility of the witness or casts doubt on the testimony itself.

As to Dr. Li's testimony that plaintiff would need future revisions, defendant argues it should be stricken because it was not properly disclosed. The Court disagrees. At his deposition, Dr. Li was asked directly by plaintiff's counsel whether he was concerned that performing a revision on a young person meant "that they'll have to have one or more revision surgeries." (Doc. 445-2, at 18–19). Dr. Li responded, "yes." (*Id.*). Although the question was not whether "someone as young as plaintiff" would need one or more revisions, the context of the deposition and previous discussion involving plaintiff implied this question applied to plaintiff. Plaintiff then stated in her expert disclosure under Federal Rule of Civil Procedure 26(a)(2)(c) that Dr. Li was the

treating physician expert who would testify "as to his care of Plaintiff . . . and the subjects discussed during his depositions." (*Id.*). Thus, the opinion had been raised before and the subject was disclosed in the expert disclosures.

Also, knowing about future treatment is a part of a treating physician's regular care of a patient. It is true Dr. Li had not seen plaintiff for several years before he testified at trial that she would need at least one more revision, but the Court does not see why that would be necessary. Dr. Li knew his patient, her lifestyle (which he cited as a reason for selecting the M2a Magnum), and the average lifetime of an implant. This is enough of a basis to draw a conclusion about future damages even without a recent visit. Again, if anything, the lack of a recent visit merely provided a basis to attack Dr. Li's opinion on cross examination, not a reason to exclude it entirely. The Court further notes that any error here would be harmless because evidence was admitted without objection about the average lifespan of an artificial hip lasting 10 to 15 years. (Doc. 451, at 90). It is a matter of simple math, given plaintiff's life expectancy, that she would likely need one to two more revisions.

### b.      Unreliable under FRE 702

Defendant also argues that Dr. Li's "causation and damages opinions also should have been excluded because they were not sufficiently reliable to satisfy Federal Rule of Evidence 702 or *Daubert*." (Doc. 430, at 33). According to defendant, "Dr. Li's causation opinions are based on speculation" and his "future damages opinions did not have a sufficient foundation to be introduced to the jury." (*Id.*).

The Court finds that Dr. Li's causation opinions were not based on speculation and were properly explained at trial. During his testimony, Dr. Li explained that the loosening of the cup was not a result of his surgical placement or techniques and that he did not see any evidence that smoking or the medial wall crack caused the need for a revision. Dr. Li further explained why he thought these other factors did not contribute

to the cup loosening and plaintiff needing a revision. Dr. Li's testimony was all based on his own observations of plaintiff's surgery and recovery. In other words, Dr. Li conducted an appropriate differential diagnosis and ruled in and ruled out potential causes based on his own personal observations as the treating physician.

Similarly, Dr. Li had a proper foundation for his opinion on future damages. As the Court discussed above, knowing about future treatment is a part of a treating physician's regular care of a patient. It is also a simply matter of math given the undisputed average life of a hip transplant and plaintiff's life expectancy. It is true Dr. Li had not seen plaintiff for several years before he testified at trial that she would need at least one more revision, but the Court does not see why that would be necessary. Dr. Li knew his patient, her lifestyle (which he cited as a reason for selecting the M2a Magnum), and the average length of an implant. This is a sufficient foundation upon which to offer an opinion of future damages.

### 5. *Dr. Kantor's testimony*

Defendant alleges the Court erred in permitting plaintiff's "common-issue expert Dr. George Kantor to testify that Biomet's decision to market the M2a Magnum without performing clinical testing was unethical and bordered on criminal behavior." (Doc. 430, at 35). Defendant argues any reference to marketing was irrelevant because all warning and representation-based claims were dismissed. (*Id.*, at 36). Defendant also argues any testimony about marketing the M2a Magnum without performing clinical testing was outside the scope of Dr. Kantor's allowed expert testimony. (*Id.*, at 37). Even if otherwise admissible, defendant argues Dr. Kantor's statements were inflammatory and unduly prejudicial under Federal Rule of Evidence 403. (*Id.*, at 39).

First, the Court finds Dr. Kantor did not testify about the marketing of the M2a Magnum. At several points during direct examination, plaintiff's counsel asked Dr. Kantor about clinical studies that were performed on metal-on-metal devices before the

product was marketed. For example, plaintiff's counsel asked: "What is your opinion with respect to the dangerousness of marketing a product without doing clinical testing?" To which Dr. Kantor responded in part, "I think it's unethical. I think it borders on criminal behavior, if you know that that—if you know that that material can be deleterious and harmful to patients, including—including the life of patients, because of the complications related to the introduction—reintroduction of a failed material." (Doc. 450, at 284) (typo omitted). Nothing in this line of questioning, or in the other places where counsel mentioned marketing, discusses marketing in a way that was excluded by the Court's previous orders. The Court's previous orders addressed marketing in an advertising sense, or how a business decides to communicate the product to its customers. *See* (Doc. 355, at 6). Marketing, as used in the trial testimony here, refers to a decision to introduce a product onto the market. These are two very different concepts, the latter of which was not contemplated by or excluded by any of the Court's orders. The term "marketing" cannot be interpreted so broadly to exclude every meaning of the word, even when not relevant or contemplated by the Court's orders.

Second, the Court finds Dr. Kantor's testimony was within the scope of his permitted testimony. The MDL court found that Dr. Kantor could not offer his opinions about Biomet's testing because he did not consider the data required to offer a reliable opinion. (Doc. 430, at 37). Dr. Kantor's trial testimony did not opine on Biomet's testing. As discussed above, when plaintiff's counsel asked Dr. Kantor his opinion on marketing a product without doing clinical testing, Dr. Kantor responded that he thinks it is unethical and borders on criminal behavior. Nothing in counsel's question asks Dr. Kantor to opine on the sufficiency of the M2a Magnum's testing or Biomet's testing. Dr. Kantor was simply asked what his opinion was of the dangerousness of failing to do adequate testing generally. Moreover, Dr. Kantor's response was similarly phrased in general terms with no specific mention of defendant or the M2a Magnum.

32

Last, defendant argues that Dr. Kantor's testimony should have been excluded because any value it had was substantially outweighed by Dr. Kantor's use of inflammatory language which unfairly prejudiced defendant and confused the jury. (*Id.*, at 39). It is true that Dr. Kantor's testimony did become contentious at various points, but not to the point that the Court finds it was unfairly prejudicial. Dr. Kantor's opinions on testing go directly to the issue of punitive damages. That he stated them empathetically and in no uncertain terms does not make them unduly prejudicial. Indeed, the jury was able to observe his overall demeanor and presentation and draw their own conclusions from his occasionally pointed answers.

Thus, the Court did not err in allowing Dr. Kantor's testimony about the testing.

### 6. *Mari Truman medical causation testimony*

Defendant next argues that "[t]he Court erred in allowing Mari Truman to discuss causation." (*Id.*). Defendant asserts that Truman was permitted to discuss her medical causation opinions, which should have been excluded per the pre-trial *Daubert* orders. (*Id.*, at 39–40). Defendant provides 11 specific examples of instances in which Truman allegedly gave impermissible opinions. (*Id.*, at 41–42). Significantly, defendant acknowledges that the Court did sustain, on at least three occasions, defendant's objections to Truman's testimony at issue here and struck her answers from the record. Defendant also concedes that the Court instructed the jury that Truman was not a doctor, was not testifying about the actual biological effect of metal ions, did not have her own personal knowledge of metal ions and how they affect the body, and that testifying about the effects of metal ions on the body was beyond her expertise. (*Id.*, at 41 n.20).

On the second day of trial, outside the presence of the jury, defendant's counsel alerted the Court that Truman had recently provided testimony in another related case that exceeded her expertise and permissible testimony. Because defense counsel explained their concern to the Court, the Court refreshed its memory of the previous

33

*Daubert* rulings, the confines of Truman's testimony, and was on alert for issues throughout her testimony. When Truman's testimony did indeed deviate from what was permissible and into topics of metal ions and medical causation, the Court responded to the objections quickly and thoughtfully. As defendant noted in its brief, the Court sustained at least three of these objections and granted defendant's request to strike the testimony. The Court also instructed the jury that they were to disregard the answers and explained to them that Truman was not an expert qualified to opine on such matters.

In the Court's view, this is exactly how trials should proceed. The Court was alerted to a specific issue which allowed it to review the applicable rulings and standards on the issue and then quickly make rulings as the issues arose. The Court was able to sustain appropriate objections to keep answers out, strike several answers when necessary, and give the jury an instruction explaining the limitations on Truman's testimony. There is never going to be a perfect trial in which every line of testimony is neatly confined within admissible parameters. That is the role of objections by counsel. A new trial here would undoubtedly also have moments when testimony stretches beyond the boundaries of admissibility and must be clipped back by the Court. Here, the way the testimony, objections, and curative instructions proceeded were ordinary, effective, and did not unduly prejudice defendant.

Although the Court agrees with plaintiff's assertion that the causation testimony would have been introduced through Dr. Li and Dr. Naide, the Court disagrees that makes an error harmless. There is some potential for harm in the cumulative effect of multiple witnesses saying the same thing. For instance, if one witness testifies to a conclusion a jury may either believe it or not believe it. If several witnesses testify to the same thing, it is harder to view the conclusion as an outlier. In any event, the Court finds that it did not err in admitting Truman's causation testimony and that the sustained

34

objections and curative instructions sufficiently remedied Truman's inadmissible testimony.

Thus, the Court finds it did not err in permitting Truman's causation testimony and it does not serve as a basis for a new trial.

### 7. Biomet's 2014 sale price

The Court turns next to the question of whether it erred in allowing plaintiff to introduce defendant's 2014[5] sale price into evidence and if it did, whether a new trial is required.

Generally, evidence of a defendant's pecuniary interest is admissible where the plaintiff seeks and the evidence supports punitive damages. *Hall v. Montgomery Ward & Co.*, 252 N.W.2d 421, 424 (Iowa 1997). "The rationale . . . is that the jury needs to know the extent of the defendant's holdings in order to know how large an award of damages is necessary to make him smart." *Id.*

The relevant authority offers little guidance on how a defendant's holdings should be calculated and how this information should be used by a jury. For example, the Iowa Civil Jury Instruction relating to punitive damages instructs that "[y]ou may consider the defendant's financial condition or ability to pay" in determining the amount of punitive damages. Iowa Civil Jury Instruction 210.1. The jury instruction says nothing about what evidence should be used to make that determination.

The Iowa cases defendant cites do not offer much additional guidance either. Each of the cases appear to consider the current net worth of the defendant corporation, but none of them explain the rationale behind using the current net worth and none of them preclude using a different value. *See, e.g.*, *Hall*, 252 N.W.2d at 424 (allowing a department store's balance sheet and operating expenses to be admitted into evidence,

---

[5] Plaintiff asserts the SEC filing showed the value of the company in 2015, not 2014. The date of the SEC filing is not material to the Court's analysis.

but not containing any discussion on the appropriate balance sheet to use); *Hoekstra v. Farm Bureau Mut. Ins. Co.*, 382 N.W.2d 100, 109–10 (Iowa 1986) (stating that "[e]vidence of net worth is admissible on the issue of punitive damages," but declining to discuss further because no punitive damages were awarded). The only cases defendant cites that explicitly say the current net worth should be used are from other jurisdictions and are not binding on this Court. *See, e.g.*, *LL B Sheet 1, LLC v. Loskutoff*, No. 16-cv-02349-BLF (HRL), 2016 WL 7451632, at *3 (N.D. Cal. Dec. 28, 2016); *Boyd v. Hi-Country Chevrolet*, CIV 10-0602 RB/KBM, 2011 WL 13289889, *2 (D.N.M. Mar. 10, 2011).

On the one hand, it makes the most sense to use the current valuation. The objective of punitive damages is to punish and discourage like-conduct by the defendant, and a jury needs to know the current valuation to sufficiently come up with a number that will serve that purpose. On the other hand, a relatively recent historical valuation can provide significant insight into a company's worth, even if intervening events have caused the worth to change. Here, there is no ideal valuation. Biomet merged with Zimmer in 2015, forming the company Zimmer-Biomet. Zimmer-Biomet is not the defendant in this case and thus, its value should not determine the punitive damages award. Biomet's 2014 price is also somewhat problematic because it is seven years old and circumstances have almost certainly changed over that time. Nonetheless, it is still relevant, helpful, and legally permissible for the jury to be presented with a number so they render an award that achieves the goals of punitive damages. Given the circumstances, the Court finds the 2014 sale price was appropriate. Also, the Court gave defendant the opportunity to present counter evidence that would rebut the 2014 sale price. Defendant argues no evidence it could present would cure the error of the jury seeing the 2014 sale price. (Doc. 430, at 44 n.21). The Court sees no reason why that would be the case and indeed finds it an appropriate and workable solution.

36

Thus, the Court finds it did not err in admitting the 2014 sale price and declines to grant a new trial on those grounds.

### 8. Applying Iowa law to punitive damages

To determine which body of law applies to a dispute, a court must apply the conflict of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). When confronted with a potential conflict of laws issue, the first step is to determine whether there is a "true conflict" between the different bodies of law that could govern. *Phillips v. Marist Soc'y of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996) (citation omitted). In tort cases, Iowa applies the Restatement (Second) Conflict of Laws' "most significant relationship" test in considering conflict of laws issues. *Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897 (Iowa 1996). The *Restatement* provides as follows:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place where the injury occurred,
>> (b) the place where the conduct causing the injury occurred,
>> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
>> (d) the place where the relationship, if any, between the parties is centered.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (AM. LAW. INST. 2018). Section 6 of the *Restatement*, as referred to in Section 145, reads as follows:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

37

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6. "[A]lthough 'place of injury' is certainly a factor in the conflict-of-laws analysis under Iowa law . . . there is no presumption that the law of the 'place of injury' should apply pursuant to Restatement (Second) of Conflict of Laws § 146" and instead Section 145's "most significant relationship" test applies. *Jones ex rel Jones v. Winnebago Indus., Inc.*, 460 F. Supp. 2d 953, 968 (N.D. Iowa 2006).

First, there is a true conflict between Iowa and Indiana punitive damages law. Under Iowa law, punitive damages may be awarded if "there is proof of conduct that establishes a 'willful and wanton disregard for the rights of another.'" *Estate of Thompson v. Kawasaki Heavy Indus., Ltd.*, 922 F. Supp. 2d 780, 798 (N.D. Iowa 2013) (quoting *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 142 (Iowa 1996). "[P]unitive damages are appropriate only when actual or legal malice is shown" and "[m]ere negligent conduct is therefore not sufficient to support" a punitive damages claim. *Id.* Under Indiana law, "[t]he standard used to determine whether punitive damages are properly awarded is whether, considering only the evidence and reasonable inferences supporting the judgment, a reasonable trier of fact could find by clear and convincing evidence that the defendant acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, mere negligence, or other human failing." *Wohlwend v. Edwards*, 796 N.E.2d 781, 784 (Ind. Ct. App. 2003). Also, Indiana caps

punitive damages under Ind. Code § 34-51-3-4, while Iowa does not. Thus, there is a true conflict based on the existence of a punitive damages cap under Indiana law and different legal standards between the two states. Because there is a true conflict between the states' laws, the Court must consider the Section 145 factors to determine which state has the most significant relationship.

Turning to the first factor, both parties appear to agree that the injury occurred in Iowa. (Docs. 364, at 4; 366, at 14). The Court agrees. Plaintiff was indisputably implanted with the M2a Magnum in Iowa and suffered from the revision in Iowa.

The parties do not agree on the second factor, namely the place where the conduct causing the injury occurred. Defendant asserts Indiana was the place where the conduct causing the injury occurred because it was where the device was designed and where decisions as to the design of the product occurred. (Doc. 366, at 14–15). Plaintiff asserts that although the device was designed in Indiana, wrongdoing occurred in Iowa when defendant marketed and sold its device in Iowa. (Doc. 344, at 4). The Court finds that the conduct occurred in both Indiana and Iowa and thus, this factor does not weigh heavily in favor of either side. It is true that defendant has its headquarters in Indiana and the device was designed there, but it is also true that they sold their allegedly defective product in Iowa and received payment from Iowa residents. The factor does, however, weigh slightly towards Indiana given that the corporate decisions are perhaps more relevant to the punitive damages award than the resulting targeting, marketing, and sale in Iowa.

Third, plaintiff is a resident of and domiciled in Iowa and defendant's principal place of business is in Indiana, of which there is no dispute. (Docs. 364, at 5; 366, at 14). This factor does not weigh heavily in favor of either part.

Last, there is no ongoing center of the parties' relationship. The parties' relationship is dependent entirely on the M2a Magnum and the continuing nature of this

39

lawsuit but is otherwise nonexistent. To the extent there was a center of the relationship, the Court finds it is in Iowa. Plaintiff never left the state, but instead relied on marketing, sales, and distribution of the device in Iowa. This factor weighs slightly in favor of applying Iowa law.

Also, the Section 6 factors do not suggest that Indiana has a more significant relationship to the claim than Iowa or that Indiana has a greater interest in the adjudication of these claims.

On balance, the Court finds the factors favor applying Iowa law. Although the device was designed in Indiana, the injury occurred in Iowa, the relationship was primarily centered in Iowa, and the Section 6 factors support Iowa's interest in this matter. Part of the conduct did occur in Iowa when defendant marketed and sold its device in the state, and there is a preference for the law of the state in which the Court sits. Thus, considering these factors, the Court finds Iowa law should apply to punitive damages and that it did not err in applying Iowa law.

### 9. Submitting punitive damages to jury

The Court has already discussed at length the evidence supporting the punitive damages claim in the punitive damages section of the renewed judgment as a matter of law section above. The Court need not restate the evidence it considered above to support the sufficiency of the jury's verdict on punitive damages. Based on the same evidence, and for the same reasons, the Court finds it did not err in submitting the issue of punitive damages to the jury and declines to overrule its previous decision on punitive damages here.

### 10. Cumulative effect

"Evidentiary errors affect a party's substantial rights when the cumulative effect of the errors is to substantially influence the jury's verdict." *Williams*, 223 F.3d at 755.

In other words, even when individual errors are harmless, their cumulative effect could result in an unfair trial. *United States v. Eizember*, 485 F.3d 400, 405 (8th Cir. 2007).

As discussed above, the Court found that it did not err in many of the ways defendant asserts. The Court does not claim to have conducted a perfect trial, however, and acknowledges there were several times when it could have ruled differently. The Court does not find that the cumulative effect of any errors resulted in an unfair trial. This case involved complex facts and issues. There were good arguments and convincing evidence on both sides. Over the course of a nine-day trial, the parties ably argued their points and presented evidence in painstaking detail, after which the jury reached an informed verdict.

It is impossible to know whether the outcome would have changed if the Court had ruled differently on several items. What appears completely convincing in a legal brief may have no effect on a reasonable jury. It is also likely that if the verdict had come out the other way, plaintiff would have raised objections to how the Court handled other evidentiary and legal issues. In other words, there were rulings that were favorable and unfavorable to both sides and no side. On balance, though, the Court finds this was a fair trial. There is nothing in the record that convinces the Court that if it had ruled another way on one item, or several items in combination, that it would have influenced the jury one way or the other. To find as much would be purely speculative and would require an inappropriate dive into the minds of the jury. Thus, any errors the Court may have made at trial are not so substantial that they, alone or in combination, raise the likelihood of an unfair trial.

### D. Remittitur

Defendant argues in the alternative that the Court should remit the jury's damages award. When presented with a question as to whether a state law claim damage award is excessive, state substantive law guides the review. *Jones v. Swanson*, 341 F.3d 723,

41

736 (8th Cir. 2003). The Iowa Supreme Court has adopted the following standard in considering remittitur:

> We will reduce or set aside a jury award only if it (1) is flagrantly excessive or inadequate; or (2) is so out of reason as to shock the conscience or sense of justice; or (3) raises a presumption it is a result of passion, prejudice or other ulterior motive; or (4) is lacking in evidentiary support. The most important of the above enumerated tests is support in the evidence. If the verdict has support in the evidence the others will hardly arise, if it lacks support they all may arise. If a verdict meets this standard or fails to do substantial justice between the parties, we must either grant a new trial or enter a remittitur.

*Condon Auto Sales & Serv., Inc.*, 604 N.W.2d at 595, as amended on denial of reh'g (Feb. 4, 2000) (internal citations omitted). "Juries have considerable flexibility in determining the level of punitive damages." *Ondrisek v. Hoffman*, 698 F.3d 1020, 1028 (8th Cir. 2012).

The compensatory damages award totaled $1,050,000 and was comprised of $500,000 for past pain and suffering, $100,000 for past loss of function, $250,000 for future pain and suffering, and $200,000 for future loss of function. (Doc. 419). Defendant argues the compensatory damages award is "grossly excessive in light of the narrow grounds for liability and the evidence presented at trial." (Doc. 430, at 49).

Here, there is sufficient evidence to sustain the jury's verdict on compensatory damages. First, plaintiff produced evidence that at some point after she received her M2a Magnum she complained of pain to her implanting surgeon. Next, her implanting physician performed a revision surgery. Third, there was testimony that plaintiff will very likely need at least one more revision in her lifetime. Defendant asserts that plaintiff, at most, experienced some mild pain for a couple years and had to endure 4 days in the hospital and 6 weeks of physical therapy at home. (Doc. 430, at 50). This may not be significant for defendant, but the jurors viewed this evidence differently. That defendant viewed the pain and suffering and loss of function less than the jurors did is not a reason

to overturn the verdict. Also, "awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." *Eich v. Bd. of Regents for Ctr. Mo. State Univ.*, 350 F.3d 752, 763 (8th Cir. 2003). Thus, if the jury, through their experience and review of the evidence found compensatory damages in a certain amount, the Court should be highly reluctant to overturn it.

In addition to reducing compensatory damages, defendant also asks the Court to "order remittitur of the $2,500,000 punitive damages award" and reduce the punitive damages award to $0. (Doc. 430, at 52). "[P]unitive damages are aimed at . . . deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408–09, 416 (2003) (citations omitted). "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) (citations omitted). Nevertheless, "it is well established that there are procedural and substantive constitutional limitations on these awards." *Campbell*, 538 U.S. at 416 (citations omitted). "[P]unitive damages are grossly excessive if they 'shock the conscience of this court or . . . demonstrate passion or prejudice on the part of the trier of fact.'" *Ondrisek*, 698 F.3d at 1028 (quoting *Stogsdill v. Healthmark Partners, L.L.C.*, 377 F.3d 827, 832 (8th Cir. 2004)) (alteration in original).

The United States Supreme Court has established three "guideposts" for reviewing a punitive damages award: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418 (citation omitted). Courts view the degree of reprehensibility as the most important factor. *Id.* at 419 (citing *Gore*, 517 U.S. at 575). Reprehensibility

43

requires consideration of factors such as to whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* (citing *Gore*, 517 U.S. at 576-77).

Reviewing these factors in light of the evidence in this case, the Court finds there was enough evidence to sustain the jury's $2.5 million dollar award of punitive damages. On the first element involving reprehensibility, the harm caused was physical harm and the conduct considered by the jury evidenced an indifference to the safety of others by foregoing testing and putting profits first. The punitive damages award is reasonably proportional to the actual and potential harm suffered by plaintiff. The jury, through its analysis of evidence, determined that $1,050,000 in compensatory damages was justified. The amount of punitive damages to actual damages is approximately 2.4 to 1. This is well below the 4.8 to 1 ratio that is often considered the upper end of the disparity. *May v. Nationstar Mortgage, LLC*, 852 F.3d 806, 817 (8th Cir. 2017) (citations omitted). Last, the punitive damages award here is comparable to those found in similar cases. For example, in *Christiansen v. Wright Medical Technology, Inc.*, 851 F.3d 1203 (11th Cir. 2017), the Eleventh Circuit Court of Appeals affirmed the district court's decision to award $1.1 million in punitive damages against a medical device manufacturer. As here, *Christiansen* involved a plaintiff who needed a revision after being implanted with a metal-on-metal hip. *Id.* at 1205. *Christiansen* also involved allegations that the defendant did not properly test the effects of metal ions before it released the device on the market and the compensatory damage award was $1 million. *See In re Wright Med. Tech. Inc.*, 1:13-cv-297-WSD, 2015 WL 12090063, at *5–6 (N.D. Ga. Nov. 18, 2015); *see also Christiansen*, 851 F.3d at 1339. Even though the $1.1 million awarded in *Christiansen*

is lower than the $2.5 million awarded here, it is not such a significant difference that it requires the Court find an injustice has occurred here. Thus, the factors support a finding that the punitive damages award is not excessive.

As a final note, the Court also disagrees with defendant's assessment that "[a] reasonable jury would not have awarded any punitive damages." (Doc. 430, at 52). This jury was selected in part by defendant and listened attentively to evidence for nine days. After, the jurors drew upon their experiences and observations and determined, as a group, that punitive damages were appropriate. Other than defendant's own belief that the jurors got it wrong, there is nothing in the record or in the juror's conduct that indicates any sort of passion or prejudice. In short, defendant's broad assertion that the jury was unreasonable is not in accord with the record or the Court's observation of the jury's participation in this case.

For these reasons, defendant's request for a remittitur is **denied** as to both compensatory and punitive damages and defendant's motion for a new trial is **denied** in its entirety.

### IV.    *MOTION TO AMEND JUDGMENT*

In its Motion to Amend Judgment, plaintiff moves to amend the judgment as it relates to pre and post-judgment interest and the allocation of punitive damages. (Doc. 433). Defendant only resists the motion to amend judgment on the grounds that it raised in the previous motions, namely, that judgment should be granted in their favor or alternatively a new trial or remittitur should be granted. The Court denied each of those motions above and similarly denies them here.

Plaintiff does not identify under which rule of civil procedure she brings this motion. Typically, motions to amend a judgment are raised under one of two rules. First, Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." The language of Rule 59(e) provides

only a deadline for motions "to alter or amend," without specifying the standards for alteration or amendment. The Eighth Circuit Court of Appeals has explained that, under Rule 59(e), a court may alter or amend a judgment only if it finds a "manifest" error of law or fact in its ruling. *See Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988) (quoting *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.), *as amended*, 835 F.2d 710 (7th Cir. 1987), quoting in turn *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 665–66 (N.D. Ill. 1982), *aff'd*, 736 F.2d 388 (7th Cir. 1984)). The Eighth Circuit Court of Appeals has more fully explained the standard under Rule 59(e):

> Federal Rule of Civil Procedure 59(e) was adopted to clarify a district court's power to correct its own mistakes in the time period immediately following entry of judgment. Rule 59(e) motions serve a limited function of correcting manifest errors of law or fact or to present newly discovered evidence. Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment.

*Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998) (internal quotations omitted) (citations omitted).

Second, Federal Rule of Civil Procedure 60 provides that "[t]he court may correct . . . a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." "Rule 60(a) is used to provide relief from judgment based on . . . mistakes in the record where the parties' intentions are clearly defined and all the court need do is employ the judicial eraser to obliterate a mechanical or mathematical mistake." *EEOC v. CRST Van Expedited, Inc.*, No. 07-CV-95-LRR, 2017 WL 4873070, at *2 (N.D. Iowa Oct. 27, 2017) (citing *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1539 (8th Cir. 1996)) (internal quotation marks and alterations omitted). In sum, "[t]his rule allows the district court to correct omissions in its judgment so as to reflect what was understood, intended and agreed upon by the parties and the court."

*United States v. Mansion House Ctr. N. Redevelopment Co.*, 855 F.2d 524, 527 (8th Cir. 1988) (per curiam).

Plaintiff's motion appears proper under both Rule 59(e) and 60 because it is not introducing new evidence or legal theories, but instead is raised to correct an oversight because the judgment did not include pre and post-judgment interest and did not specify how the punitive damages should be distributed. Because the motion is proper under either rule, the Court will analyze it under Rule 59(e) and need not also analyze it under Rule 60.

### A.    *Pre and Post-Judgment Interest*

Courts have found that "a motion for prejudgment interest is subject to Rule 59(e) because it 'is an element of plaintiff's complete compensation' and 'it does not raise issues wholly collateral to the judgment in the main cause of action.'" *Reyher v. Champion Int'l Corp.*, 975 F.2d 483, 488 (8th Cir. 1992) (quoting *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989). Like prejudgment interest, post-judgment interest is also an element of plaintiff's complete compensation and does not raise issues wholly collateral to the judgment in the main cause of action. Title 28, United States Code, Section 1961 states: "Interest shall be allowed on any money judgment in a civil case recovered in a district court." Courts have found Section 1961 to mean that post-judgment interest is mandatory and should be awarded. *Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburgh*, 735 F.3d 993, 1007 (8th Cir. 2013). Because post-judgment interest is mandatory, it is an element of plaintiff's compensation and does not raise issues wholly collateral to the judgment.

"The award of [prejudgment] interest is mandatory and should be awarded even when interest has not been requested." *Hughes v. Burlington N. R.R. Co.*, 545 N.W.2d 318, 321 (Iowa 1996). Prejudgment awards in Iowa are governed by Iowa Code Section 535.3(1), which states that interest should be calculated at a rate according to Section

668.13. When following the directions clearly laid out in Section 668.13 here, the amount of prejudgment interest is calculated at $96,457.62.[6]

As it applies to calculating post-judgment interest, Section 1961 provides: "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."

Because the motion was properly raised and because post-judgment interest is mandatory, the Court therefore amends the judgment here to clarify plaintiff's entitlement to post-judgment interest. Thus, the Motion to Amend the Judgment is **granted**. The judgment is hereby amended to state that it includes post-judgment interest at a rate of .12% from its date of entry, November 23, 2020, and shall accrue until the entire award is paid. Also, the final judgment is amended to include statutory prejudgment interest in the amount of $96,457.62 for a total judgment of $3,646,457.62.

### B. Punitive Damages

Iowa law contains specific rules for allocating punitive damages awards, particularly in cases where the jury found the conduct supporting the punitive damages award was not directed specifically at plaintiff. Iowa Code Section 668A.1(2)(b) states:

> If the answer or finding pursuant to subsection 1, paragraph "b", is negative, after payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into a civil reparations trust fund administered by the state court administrator. Funds placed in the civil reparations trust shall be under the control and supervision of the executive council, and shall be disbursed only for purposes of indigent civil litigation programs or insurance assistance programs.

---

[6] The Court adopts plaintiff's calculations found at Doc. 433, page 3.

In other words, the Court must consider the allocation of punitive damages for attorneys' fees, costs not taxed in the case, claimant award, and the civil reparations fund award.

First, as to attorneys' fees, Section 668A.1 "contemplates payment of the applicable costs and fees from the *gross* punitive damage award prior to distributing any portion thereof." *Fernandez v. Curley*, 463 N.W.2d 5, 8 (Iowa 1990). "[T]he word 'fees' include[s] plaintiff's reasonable attorney fees applicable to the recovery of the punitive damages award . . . measured by a reasonable contingent fee agreement." *Id.* Here, plaintiff agreed to pay her counsel a 38.33% contingency fee and that amount, plus post-judgment interest, should be allocated for attorneys' fees. *See* (Doc. 433, at 5).

Second, there is a question of the proper amount for the costs. Under Section 668A.1, costs are not limited to taxable costs. *Id.* at 8–9. Taxable costs are recoverable as a matter of right but non-taxable costs are recoverable on punitive damages because "[t]he judgment against the defendant for punitive damages is an additional obligation over and above the obligation of costs." *Id.* at 9. As discussed in the next section, the Court finds a total of $13,095.60 in taxable costs. That leaves a remainder of $133,681.27 in non-taxable costs.[7] These non-taxable costs are recoverable under Section 668A.1 and the Court finds they should be paid out of the punitive damages award.

Third, "after payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into the civil reparations trust fund." *Bruhn Farms Joint Venture v. Fireman's Fund Ins. Co.*, No. 13-CV-4106-CJW, 2017 WL 2888585, at *10 (N.D. Iowa May 11, 2017). "[T]he fractional

---

[7] The Court arrived at this number by taking the total amount claimed in plaintiff's amended bill of costs ($146,776.85) and subtracting the costs the Court found were taxable. *See* (Doc. 440-1).

percentage to be paid to plaintiff tied to the amount of punitive or exemplary damages actually awarded rather than the amount remaining after payment of fees and costs." *Fernandez*, 463 N.W.2d at 8. Thus, 25 percent[8] of the $2.5 million punitive damages award is $625,000, which shall be paid to plaintiff.

Last, "the remainder of the award [is] to be ordered paid into a civil reparations trust fund administered by the state court administrator." IOWA CODE § 688A.1(2)(b). Here, that amount is $783,068.73.

Thus, plaintiff's motion to amend the judgment (Doc. 433) is **granted**.

## V. BILL OF COSTS

### A. Applicable Law

Federal Rule of Civil Procedure 54(d) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Title 28, United States Code, Section 1920 states that the following six expenses are taxable as costs:

(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
(5) Docket fees under [Title 28, United States Code, Section 1923];
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under [Title 28, United States Code, Section 1828].

---

[8] Iowa Code Section 668A.1 says the amount to be paid to the plaintiff is *not to exceed* 25 percent. There is no argument that a percentage less than 25 percent should apply here and thus, the Court will apply the 25 percent contemplated in the Iowa Code.

"[F]ederal courts are bound by the limitations set out in section 1920." *168th & Dodge, LP v. Rave Reviews Cinemas, L.L.C.*, 501 F.3d 945, 957 (8th Cir. 2007) (quoting *Brisco-Wade v. Carnahan*, 297 F.3d 781, 782 (8th Cir. 2002)).

"A prevailing party is presumptively entitled to recover all of its [taxable] costs." *Id.* (quoting *In re Derailment Cases*, 417 F.3d 840, 844 (8th Cir. 2005)). Indeed, "[c]osts, unlike attorney's fees, are awarded to a prevailing party as a matter of course, unless the district court directs otherwise; unusual circumstances need not be present." *Poe v. John Deere Co.*, 695 F.2d 1103, 1108 (8th Cir. 1982) (citation omitted). Despite this presumption, Rule 54(d)'s permissive phrasing "generally grants a federal court the discretion to refuse to tax costs in favor of the prevailing party." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 762 (8th Cir. 2006).

Although a district court has discretion in this area, "it must provide a rationale" if it denies taxable costs to a prevailing party. *McFarland v. McFarland*, Nos. C08-4047-MWB, C09-4047-MWB, 2011 WL 5554267, at *2 (N.D. Iowa Nov. 15, 2011). In other words, the losing party must show that an award of costs "is inequitable under the circumstances." *Concord Boat Corp. v. Brunswick Corp.*, 309 F.3d 494, 498 (8th Cir. 2002) (citation omitted). A general statement of fairness, however, is insufficient to rebut Rule 54(d)(1)'s presumption. *Thompson v. Wal-Mart Stores, Inc.*, 472 F.3d 515, 517 (8th Cir. 2006).

### B.     Analysis

Plaintiff's bill of costs here totals $197,322.69. (Doc. 424, at 1). Broadly, this total is comprised of $950.00 for "[f]ees of the Clerk," $750.00 of "[f]ees for service of summons and subpoena," $23,107.32 for "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case," $3,253.14 for "[f]ees and disbursements for printing," $320.00 for "[f]ees for witnesses," $432.22 for "[f]ees for exemplification and the costs of making copies of any materials where the copies are

51

necessarily obtained for use in the case," and $168,510.01 for "[o]ther costs." (*Id.*). Plaintiff provides 17 exhibits in support of these costs. (Docs. 424-2–424-18). Defendant objects to all but $4,248.27 of these costs. (Doc. 432, at 15).[9]

### 1. *Fees of the Clerk*

Plaintiff seeks $950.00 for filing fees. (Doc. 424, at 1). Plaintiff asserts the $950.00 is comprised of $350.00 paid to the Northern District of Indiana for the cost of filing the complaint and $600.00 for the cost of filing pro hac vice motions in the Northern District of Iowa. (Doc. 440, at 4–5). Defendant argues the $350.00 is not recoverable because the fee was not paid to the Northern District of Iowa and that the $600.00 is not recoverable because it is not supported with proper documentation. (Doc. 432, at 3).

The Bill of Costs Guidelines for the Northern District of Iowa clearly state that "[o]nly fees paid to the Clerk of the United States District Court for the Northern District of Iowa are taxable." *Bill of Costs Guidelines*, United States District Court for the Northern District of Iowa, at 4 (Oct. 23, 2018) (hereinafter "*Cost Guidelines*, US ND Iowa").[10] The Cost Guidelines do not specify when a filing fee is recoverable in an MDL case when the parties are expected to file in the MDL court before the case is transferred. The Cost Guidelines do, however, state that in a removal case, fees paid to the state clerk of court are not taxable. *Id.* This indicates that the filing fees are only available for fees paid to the Clerk of the United States District Court for the Northern District of Iowa. Here, the $350 filing fee for the complaint was paid to the Northern District of Indiana and thus, is not recoverable.

---

[9] Plaintiff filed an amended bill of costs with its reply to defendant's resistance. (Doc. 440-1). Plaintiff concedes some of the costs in her original bill of costs should have been excluded and thus, the new total cost is reduced to $146,776.85. (*Id.*). The Court will note plaintiff's amended costs in its analysis below but will keep the original values in the background section here for reference.

[10] Available at: https://www.iand.uscourts.gov/sites/iand/files/IAND%20Draft.pdf.

The remaining $600.00 were paid to the Clerk of the District Court for the Northern District of Iowa for pro hac vice admissions. "[P]*ro hac vice* fees are recoverable as fees of the clerk under [Section] 1920." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 579 F.3d 894, 898 (8th Cir. 2009); *see also Cost Guidelines*, ND Iowa, at 10. Plaintiff has provided "a reference to the applicable docket entry in the case" as supporting documentation for the six pro hac vice filing fees. (Doc. 440, at 4–5). The pro hac vice fee is $100 in the Northern District of Iowa.[11] Given this information, this cost is properly supported.

Thus, the allowable costs for fees of the Clerk are $600.00.

### 2. Fees for Service of the Summons and Complaint

Plaintiff originally requested $750.00 for costs related to service of summons and subpoena. (Doc. 424, at 1). In response to defendant's resistance to the bill of costs, plaintiff agrees that the $525.00 cost for a private process server is not recoverable and abandons that claim. (Doc. 440, at 5). Plaintiff still requests $200.00 that refers to service of a subpoena on John Davey to appear at trial. (*Id.*).

The Cost Guidelines require parties to "submit receipts or other documentation regarding fees paid to the United States Marshal Service" to document service of process fees. The Court is unable to find any documentation regarding fees paid to the United States Marshals Service other than a line item on a bill labeled "Process service." (Doc. 424-2, at 32). This is insufficient to show a fee paid to the Marshals Service and thus, is not recoverable.

Thus, the Court sustains defendant's objections and finds the allowable costs for service fees is $0.

---

[11] *Pro Hac Vice Admission*, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA, https://www.iand.uscourts.gov/pro-hac-vice-admission.

### 3. Fees for Transcripts

"Deposition transcripts (printed or electronically recorded) are taxable by the Clerk if the transcript was necessarily obtained for use in the case." *Bill of Costs Guidelines*, US ND Iowa, at 5. Such costs are appropriately taxed when, for example, the deposition was submitted in connection with an event that terminated the litigation such as summary judgment. (*Id.*). A deposition transcript may also be taxable if "[t]he requesting party explains why the transcript was necessarily obtained." (*Id.*). "The determination of necessity must be made in light of the facts known at the time of the deposition, without regard to intervening developments that later render the deposition unneeded for further use." *Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356, 363 (8th Cir. 1997) (citation omitted). Transcripts that are ordered for purely investigative purposes are not reasonably necessary and thus not taxable. *Slagenweit v. Slagenweit*, 63 F.3d 719, 720 (8th Cir. 1995) (per curiam).

***Deposition of Jing Xie.*** Plaintiff requests $1,907.90 in costs for obtaining the e-transcript and video of Jing Xie's deposition. Defendant argues this cost is not recoverable because Xie was not called as a witness at trial, the deposition was not played, and plaintiff has not provided any explanation as to why this cost was necessarily incurred. (Doc. 432, at 5).

It is immaterial that Xie was not called as a witness at trial and that the deposition was not played so long as plaintiff explains why the transcript was necessarily obtained. *Cost Guidelines*, US ND Iowa, at 5. Plaintiff does not, however, explain why the transcript was necessarily obtained. Plaintiff's only explanation is a conclusory statement that the "deposition testimony was necessary, and more than justified as all witnesses identified above were primary representatives of Biomet." (Doc. 440, at 7). This is insufficient for purposes of explaining the necessity of the transcript because it provides no information on Xie's role, what the testimony was elicited for, or why the same

information was not available elsewhere. Thus, plaintiff has not made a showing of why the deposition transcript was necessarily obtained.

**Deposition of John Davey.** Plaintiff combines her argument about Jing Xie with her argument about a $2,990.52 cost related to John Davy's deposition transcript. *See* (Doc. 432, at 5). For the same reasons the deposition amount is not recoverable for Jing Xie, it is also not recoverable for John Davey.

**Hearing Transcripts before Judge Mahoney and MDL Hearing Transcripts.** Plaintiff requests a total of $660.60 for hearing transcripts. (Doc. 440, at 8). Like witness depositions, trial and hearing transcripts are taxable if the transcripts are necessary for use in the case and the requesting party explains why the trial or hearing transcript was necessarily obtained. *Cost Guidelines*, ND Iowa, at 5.

Plaintiff explains that the transcripts "were necessary for use in the case in order to present accurate arguments on certain motions." (Doc. 440, at 8). The Court accepts plaintiff's explanation. Written orders usually explain a Court's reasoning and ruling on a matter in sufficient detail for a party to understand. Sometimes, however, it is beneficial to also have the hearing transcript to recall the discussion and reasoning of a court more fully so as to present accurate information and argument on certain motions. Thus, the Court finds the $660.60 for hearing transcripts is taxable.

**Trial Transcript.** For the same reasons stated in the previous section, the Court finds the fees for the trial transcripts in the amount of $6,240.00 are also taxable. *See* (*Id.*).

**Fees for Transcripts that were Incurred for the Benefit of All MDL Plaintiffs.** When costs apply to more than one case, district courts typically apportion the costs among those cases. *Marmo*, 457 F.3d at 763–64. Here, several of the transcript costs were incurred for the benefit of all the MDL plaintiffs and should have been provided by the Plaintiffs' Steering Committee. Plaintiff agrees that the transcripts should have been

provided by the Steering Committee and indeed were provided here. The format of the transcripts, however, was not compatible with and synchronized with their videotaped depositions which is why they had obtained other copies. (Doc. 440, at 8).

The Court finds that costs incurred for the benefit of all MDL plaintiffs, i.e. $4,395.25, should not be taxed here. *See* (*Id.*). The Court understands plaintiff's argument that she had to pay for additional transcripts that were compatible for this specific case, but these are documents that had already been provided and accounted for once. In the Court's view, if plaintiff chose to use a different, more compatible format, she should not be able to tax the costs. Indeed, plaintiff should not be able to pick and choose which format to use when one was already made available, while at the same time taxing the costs as well. Thus, the fees for transcripts that were incurred for the benefit of all MDL plaintiffs are not recoverable.

***Dr. Steven Kurtz Professional Fees.*** Plaintiff also seeks $1,560.00 for professional fees that Dr. Kurtz invoiced to plaintiff for his time to give his deposition. Professional fees are not part of a cost for a transcript. Thus, these fees are not taxable.

### 4. Fees and Disbursements for Printing

Plaintiff seeks $3,253.14 for printing and copying services for trial. (Doc. 424, at 1). Plaintiff's only documentation of the costs is two line items on an invoice labeled "Copying services during trial." In their reply, plaintiff states that these charges refer to the rental of the copier and printer that plaintiff's counsel rented in Iowa for use during trial. (Doc. 440, at 9–10).

This is not sufficient documentation. Plaintiff does not provide any receipt or invoice from the rental agency. It only provides an invoice of a bill to its credit card account paying off fees it has incurred. (Doc. 424-2, at 3–4). This is a receipt generated by plaintiff's counsel's firm and even though there is no indication that plaintiff has been untruthful with any of her representations to the Court, there needs to be additional

56

documentation that provides the rental rate or at least some additional information from which the defendant could form a basis for either agreeing to or contesting the costs.

Thus, the Court sustains defendant's objection to printing costs and finds they are not taxable.

### 5. *Fees for Witnesses*

Plaintiff originally sought $320.00 in witness fees. (Doc. 424, at 1). Defendant asserts there is not proper documentation for the calculation of Dr. Naide's mileage which plaintiff calculated at $80.00 but does not object to the remaining $240.00. (Doc. 432, at 9). After further review, plaintiff agreed to withdraw the $80.00 cost for Dr. Naide's mileage cost. (Doc. 440, at 10).

Thus, the total allowable costs for witness fees is $240.00.

### 6. *Copying Fees*

Plaintiff also seeks $432.22 in costs for copies of papers. (*Id.*).

Section 1920(4) states that recoverable fees include fess "for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." These costs cover only "the costs of actually trying a case in the courtroom" and do not extend to discovery-related copying expenses. *Jones v. Nat'l Am. Univ.*, No. CIV. 06-5075-KES, 2009 WL 2005293, at *6 (D.S.D. July 8, 2009); *see also Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 601–02 (8th Cir. 2009) (finding that the district court did not abuse its discretion in denying discovery-related copying expenses).

Plaintiff asserts these costs were necessarily obtained for use in the case and include important medical records. The Court agrees with plaintiff that these were necessarily obtained for use in this case. Indeed, this entire case was about plaintiff's medical history and experience with a medical device. Thus, copying fees in the amount of $432.22 are taxable.

### 7.     Other Costs

*Westlaw Research.*   Plaintiff agrees to withdraw her request for costs associated with Westlaw research and thus, the $9,076.38 for electronic research will not be taxed. *See* (Doc. 440, at 12).

*Device Storage Costs.*   Plaintiff seeks $3,312.39 in device storage costs that were incurred to store the M2a Magnum at a professional storage device facility.   (*Id.*).

"Section 1920 imposes 'rigid controls on cost-shifting in federal courts,' and 'absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's . . . costs, federal courts are bound by the limitations set out in' [S]ection 1920." *Brisco-Wade*, 297 F.3d at 782 (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444–45 (1987)).   Nothing in Section 1920 discusses evidence storage fees or any other subject that could encompass evidence storage fees.   Thus, because Section 1920 does not authorize these fees, the Court sustains defendant's objection and will not permit recovery of the $3,312.39 in device storage fees.

*Plaintiff's Counsel's Travel Expenses.*   Plaintiff agrees to withdraw her request for costs associated with travel expenses and other expenses of counsel and thus, these costs in the amount of $40,516.06 will not be taxed.   *See* (Doc. 440, at 12).

*Legal-Eze Trial Demonstratives.*   Plaintiff seeks $4,858.52 in costs for preparing trial demonstratives.   (*Id.*).   Defendant objects to this cost.

Under the Cost Guidelines: "Demonstrative exhibits [may be taxed] when necessarily obtained for use in the case and NOT merely illustrative of expert testimony of other adequate evidence." *Cost Guidelines*, ND Iowa, at 9.   Defendant argues that these demonstratives only provide basic information and were not necessary for trial. (Doc. 432, at 11).   Plaintiff maintains that the demonstratives were necessary.   (Doc. 440, at 12).   Neither party provides argument in support of their position but urges the Court to accept their version of the demonstratives' utility.   Under the applicable legal

standards, there is a presumption that the costs are taxable and it is the losing party's burden to show that an award of costs is inequitable under the circumstances. *Concord Boat Corp.*, 309 F.3d at 498. Here, defendant has not provided any rational beyond a conclusory statement that the demonstratives were not necessary. This is insufficient to overcome the presumption that the costs are taxable.

Thus, the Court **overrules** defendant's objections and costs in the amount of $4,858.52 shall be taxed.

***Expert Witness Fees.*** "The witness fee specified in [28 U.S.C. Section] 1920(3) is defined in 28 U.S.C. § 1821." *Crawford Fitting Co.*, 482 U.S. at 440. Title 28, United States Code, Section 1821 states:

> **(a)(1)** Except as otherwise provided by law, a witness in attendance at any court of the United States, or before a United States Magistrate Judge, or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States, shall be paid the fees and allowances provided by this section.
> \*\*\*
> **(2)(b)** A witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.

Witnesses may also be paid a travel allowance and a subsistence allowance. 28 U.S.C. § 1821(c)(1), (d)(1). In other words, taxable costs for an expert witness include a $40.00 per day attendance fee and travel and food expenses.

Plaintiff already claimed the mileage and daily appearance fee in the previous section labeled fees for witnesses. Aside from food receipts submitted by Truman in the amount of $64.26, none of the additional expenses—including those claimed for Dr. Li, Dr. Naide, and Dr. Kantor—are related to travel and food. *See* (Doc. 440, at 11). Even if they were, the Court is not aware of any receipts proving as much. Thus, the Court

59

will allow fees to be taxed in the amount of $64.26 for Truman's food but denies the rest as covered in other areas or because it is outside the scope of Section 1821.

*FedEx Mail Charges & Overnight Charges.* Plaintiff agrees to withdraw her request for costs associated with FedEx mail and overnight charges and thus, the $904.25 for mail charges will not be taxed. *See* (*Id.*, at 13).

*Dynamic—Trial Exhibit and Technological Support Services.* Plaintiff seeks $34,129.85 in costs for trial exhibit and technological support services. (*Id.*). As noted, "[s]ection 1920 imposes 'rigid controls on cost-shifting in federal courts,' and 'absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's . . . costs, federal courts are bound by the limitations set out in' [S]ection 1920." *Brisco-Wade*, 297 F.3d at 782 (quoting *Crawford Fitting Co.*, 482 U.S. at 444–45). Nothing in Section 1920 discusses trial exhibit and technological support services or any other subject that could encompass trial exhibit and technological support services.

Thus, this cost is not recoverable, and the Court sustains defendant's objection.

*Jury X—Trial Support and Consulting Services.* Plaintiff seeks $15,459.26 in costs for jury research and consulting services, which she maintains were reasonably necessary to effectively try the case. (Doc. 440, at 13). Nothing in Section 1920 discusses jury research and consulting services or any other subject that could encompass jury research and consulting services.

Thus, this cost is not recoverable, and the Court sustains defendant's objection.

*C.    Conclusion*

For the reasons stated above, defendant shall be taxed in the total amount of $13,095.60.

## VI.    CONCLUSION

For these reasons defendant's Renewed Motion for Judgment as a Matter of Law (Doc. 427) is **denied**, defendant's Motion for New Trial, or in the Alternative, for Remittitur (Doc. 425) is **denied**, and plaintiff's Motion to Amend the Final Judgment (Doc. 433) is **granted**.    The Court also **sustains in part and overrules in part** defendant's objections (Doc. 432) to plaintiff's Bill of Costs (Docs. 424 & 440-1), and costs in the amount of $13,095.60 are taxed in favor of plaintiff and against defendant.

**IT IS SO ORDERED** this 6th day of May, 2021.

_____

C.J. Williams
United States District Judge
Northern District of Iowa